**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 1:21-cr-000578(APM)** |
| **KELSEY WILSON,** | : | |
| | : | |
| **Defendant.** | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Mrs. Wilson, through her attorney, Kira Anne West, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), submits this memorandum to aid the Court at sentencing and hereby notifies the Court that she has received and reviewed the Presentence Report ("PSR") prepared in this case.   After carefully reviewing the PSR with Mrs. Wilson, she has objections that were sent to the probation officer and discussed  but not resolved in the final PSR.  Ms. Wilson requests that this Honorable Court impose a sentence of 12 months probation to account for:

1.     Her lack of need for incarceration, and

2.     Her lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach and her peaceful, non-destructive and non-violent behavior that day both outside and inside the Capitol building.

Mrs. Wilson comes before the Court having plead guilty  to count 4 of the

Information  filed  charging her with a violation of Title 40 U.S.C. §5104(e)(2)(G).
A sentence of one year of probation,  is a reasonable  sentence that is "sufficient,
but not greater than necessary" to address the sentencing factors and goals set forth
in Title 18 U.S.C. § 3553(a).  Under the facts of this case, such a sentence will
protect the public, provide just punishment, and afford adequate deterrence.

1. **BACKGROUND**

   **A.  Mrs. Wilson watches media coverage of The Black Lives Matter
   protests of 2020 and Trump denouncing the  2020 election**

   The summer of 2020 was a violent one for major cities across the United
States, in large part, due to the protests of Black Lives Matter (hereinafter "BLM").
After several months of being couped up because of Covid-19, people took to the
streets to protest the horrendous murder of George Floyd. Unfortunately, especially
in D.C., these protests turned violent.  These protests were widely televised on the
nightly news and other media outlets as a necessary process for vocal opposition to
systemic racism and the only way  racial justice could be effectuated.  Mrs. Wilson
watched from her home in Missouri, along with her husband,  and on the internet
as hundreds of businesses across the nation were destroyed over a period of weeks,
several people were injured, and nearly two billion dollars of damage was done by
rioters nationwide.   https://www.washingtonpost.com/local/dc-braces-for-third-
day-of-protests-and-clashes-over-death-of-george-floyd/2020/05/31/589471a4-

a33b-11ea-b473-04905b1af82b_story.html ;  https://nypost.com/2020/09/16/riots-

following-george-floyds-death-could-cost-up-to-2b/.

       After the presidential election, Donald Trump (hereinafter "Trump") and his

inner circle  began spreading the word that the election was "stolen" from him by

Democrats and others.   https://www.washingtonpost.com/politics/trump-election-

voter-trust/2020/12/20/00282aa6-407a-11eb-8db8-395dedaaa036_story.html.

False claims were made on media sources, as well as by the President himself, that

the election system had been corrupted and that the integrity of the election should

be questioned.  This Court can only understand why Mrs. Wilson came from

Missouri to D.C. when taking into account these two pivotal events in our nation's

history. While consumption of media news is no excuse for behavior, it does

demonstrate the powerful impact news stories, fake or real, have on the citizens of

this country.  The media sets the tenor for how people feel about their rights and

freedoms and can also plant notions of discontent or even outrage.  After months of

watching our major cities burn, many people became convinced that vocal displays

of outrage in the form of protesting was the only way to make their voices heard.

Additionally, because it was reported that very few people were being prosecuted

for their criminal behavior while violently protesting, (especially in the District of

Columbia) which was replayed over and over again on the nightly news, the media

helped reinforce the notion that there would be little to no consequences for

protestor actions. https://www.mauinews.com/opinion/columns/2021/07/heres-why-most-arrested-rioters-will-not-be-prosecuted/;

https://www.usatoday.com/story/news/2020/06/15/criminals-used-george-floyd-protests-cover-looting-police-say/5324881002/.   Here, in D.C., although hundreds, if not thousands, committed property crimes such as painting  federal statues and burning and breaking into private businesses in town, the number of prosecutions was negligible. https://www.nytimes.com/2020/05/31/us/politics/washington-dc-george-floyd-protests.html.   Tucker Carlson and other conservative TV show hosts noted this on their nightly news casts.

*https://www.foxnews.com/opinion/tucker-carlson-the-riots-are-not-about-george-floyd-or-racial-justice-theyre-about-trump-and-seizing-power*.

Mrs. Wilson, like millions of other Americans, ate up the media coverage of these events in the Summer of 2020.   She saw the media label destructive and violent riots as "mostly peaceful" protests and the protestors praised on national media outlets for their strongly held beliefs.  And while most of BLM protests in the summer of 2020 were, in fact, peaceful, a report studying these protests found a large number of Americans believed they were not.  The report suggested that the "disparity stems from political orientation and biased media framing… such as disproportionate coverage of violent demonstrations."

https://time.com/5886348/report-peaceful-protests/.



Image obtained from video clip at https://thehill.com/homenews/media/513902-cnn-ridiculed-for-fiery-but-mostly-peaceful-caption-with-video-of-burning.

Mrs. Wilson had limited life experiences to inform what she saw happening in our nation and had never been at or seen a protest other than what she had witnessed on media and through other news sources.  She decided  along with her husband to come to D.C. to  hear President Trump speak.  She did not suit up for combat.  She did not obscure her face.  She was not armed.  She did not yell at anyone. She wore street clothes.  She committed no violent actions in her trip to the Capitol.  She did not destroy anything. Her only desire was to see the President.  Unfortunately, going inside the Capitol was not part of her plan and she now stands

before the Court after admitting  to the Court at her plea hearing that she knew

going into the Capitol that day was wrong.

    2.   **THE TRIP TO THE CAPITOL AND JANUARY 6, 2021**

    A.   **Mrs. Wilson's trip to D.C. and her walk to the Capitol**

Mrs. Wilson believed that she should show her support for the President by

attending his rally  scheduled for January 6, 2021, at the Ellipse on the Mall.   She

had no idea about the procedural actions for the vote that day at the Capitol.  She

had no idea it could be stopped or what that even meant.  She just wanted to go see

President Trump speak. One of Mrs. Wilson's friends happened to be going and

invited them to attend with her. They rented a car and drove to D.C. Mrs. Wilson's

mother took care of her children. They were gone two days.

At the time, she was a young mother and wife, and like hundreds of

thousands of other Americans, was suffering  emotionally and economically during

the pandemic.  At no time did she ever think she was going to the Capitol, let alone

inside the Capitol. Not until President Trump's speech did she have any intention

of  going anywhere other than the Ellipse area, and not being from the area had no

real sense of where things were in relation to each other.  As the day unfolded, she

never planned or envisioned entering the U.S. Capitol.  That is, not until President

Trump invited everyone to march to the Capitol.  Mrs. Wilson followed the large

crowd there that day with no intention of doing anything. Now, after seeing what

really happened that day by watching film on numerous platforms, Mrs. Wilson is

ashamed of the fact that she allowed himself to be swept up in the moment.

**B.** **Mrs. Wilson's activities inside and outside the Capitol.**

For some time, police were able to fend off the crowd, but as we now know,

the crowd overwhelmed the few, unprepared police.[1] Officers were able to hold off

the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol was

breached through a broken window adjacent to the Senate Wing Doors, located on

the Northwest side of the building. This breach spurred the evacuation of members

of Congress and the Vice President.   More than 30 minutes later, the Senate Wing

Doors were penetrated by the crowd, pushing Capitol Police officers back into the

inside corridor as they tried to prevent further intrusion.

Mrs. Wilson was not in this first wave of hundreds of protesters.  She could

not see what was transpiring inside the Capitol.  She entered through a door. She

had no idea of the violence in other parts of the Capitol. In fact,  Mrs. Wilson had

been so far behind the first people in that she had no idea how the door was opened

or who opened it. She was a follower of the crowd, not a leader.    The confusion at

this point lies between conflating *our epistemic access* of the full scope of events

---

[1] See Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at
https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

in their entirety with *Mrs. Wilson's knowledge and intention* as the day unfolded. That is, though many others were violent leaders of the mob, pushing officers, directing people to act with violence, and conducting violence themselves etc., Mrs. Wilson was not violent nor did she intend to be so despite the actions of the others.

### C. **Hindsight is 20/20.**

Now, in retrospect, Mrs. Wilson wishes she'd never come to D.C. at all, which is terribly sad because D.C. is a place all Americans should see and experience. She never imagined going inside the Capitol and certainly never thought that violence would follow. Importantly, Mrs. Wilson did not have any intention of stopping the vote. Indeed, Mrs. Wilson's aimless following of the crowd through the Capitol that day is evidence of her lack of intent to do something in the Capitol that day, her lack of understanding where she was in the Capitol, and her herd mentality, rather than a desire to execute a plan to stop the vote that was taking place in the Senate.

Mrs. Wilson's only intention that day was to see the president. There is not a scintilla of evidence produced by the government or otherwise that she had any intention to stop the vote, that she went to the Capitol with the express purpose of stopping the vote, that she even knew where the vote even took place within the Capitol that day, and that others were there to stop it. In fact, she had no idea

where she was while she was in the Capitol and to this day could not find her way around if given the opportunity. They did find their way to Nancy Pelosi's outer office but not because they were looking for it, and were respectful while there. They were in the building less than ½ hour.

    D. **The Charges and the arrest of Mrs. Wilson**

    On August 2, 2021, a sealed criminal complaint was filed in U.S. District Court for the District of Columbia charging her with four misdemeanor offenses related to her conduct on January 6. *See* ECF No. 1. Months before, in January, the FBI went to her home to speak to her husband, Zach, whom she was with at the Capitol. The agents asked if either of them had taken any pictures of January 6 and specifically asked if they had pictures of anyone "who was there to cause trouble." They both indicated they would look through their phones and download all they could for them. The FBI then provided them with a CD to put these pictures on but unfortunately, it was not a CD for pictures. They had given them the wrong type of CD. So on their own, the Wilsons went to Walmart, bought a flash drive, and downloaded several pictures for the FBI. Mrs. Wilson contacted the FBI agent, told him she had pictures for them, but they agents never picked them up. She even left a message for them that the thumb drive was left in their mailbox for them. It sat there for days and was never picked up.[2] Many months later, Mrs.

---

[2] Keep in mind that this cooperation with the FBI was voluntary and extraordinary. Despite the mistake by the FBI agent, she made it a priority to get them what they were after. After working all day, dressing her children, helping

Wilson was called by the  FBI and they asked her to turn herself in on the charges.

So she went down to the local courthouse, turned herself in,  had her initial

appearance and was released on her personal recognizance.  She then made her

initial appearance  in the District of Columbia  on August 24, 2021, and, again, was

released on personal recognizance with conditions. *See* ECF No. 11. She later

entered a plea of guilty  via video conference before this Honorable Court on

September 27, 2021. *See* ECF #32-33.        From start to finish, pretty much

record speed for entry of guilt.

## II.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain

factors a district court is to consider when sentencing a defendant who has been

convicted of a federal offense.   Primarily, the court shall consider the nature and

circumstances of the offense and the history and characteristics of the defendant.

*See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence

imposed to: reflect the seriousness of the offense, promote respect for the law, and

provide just punishment; afford adequate deterrence to criminal conduct; protect

the public from further crimes of the defendant; and provide defendant with needed

---

them with their homework, keeping her house clean and in order, feeding the dogs, doing laundry and making
dinner, she THEN drove to Walmart to get something that would work with her pictures. Then she downloaded
everything she believed they would want.  The Wilson's don't have a housekeeper, a yard man, and a dog walker.
The Wilson's and hundreds of thousands of other Americans that work in blue collar jobs keep America moving,
hopefully forward.

educational or vocational training, medical care, or other correctional treatment in

the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets

forth the factors that the Court must consider in fulfilling this provision:

1.     The nature and circumstances of the offense and the history and characteristics of the defendant;
2.     The need for the sentence imposed;
3.     The kinds of sentences available;
4.     The kinds of sentence and the sentencing range…;
5.      Any pertinent policy statements issued by the Sentencing Commission;
6.     The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.     The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

## III.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but

not greater than necessary" in light of the factors identified in §3553(a).    *United*

*States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough*

*v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A. **Nature & circumstances of the Offense & the History and Characteristics of Mrs. Wilson**

After Mrs. Wilson walked freely into the Capitol she was impressed by the

grandeur of the building.  She had never been to the Capitol before.  Compared to

many other class B misdemeanor cases that have been filed in this Court, Mrs.

Wilson's conduct is at the bottom of the scale.  First, the defense is not aware of

any evidence that defendant's entry into the Capitol was preplanned or coordinated with anyone else, including any extremist or organized groups. Her intention was to see President Trump and that did not include going into the Capitol.  Second, the defense is not aware of any evidence that the Defendant incited others to commit acts of violence or destruction. Third, the defense is not aware of any evidence that she engaged in any violence or questionable conduct towards law enforcement. When Mrs. Wilson was asked to leave the building, she immediately made efforts to get out.  She didn't have to be asked twice and she didn't delay or try to avoid detection. Fourth, the defense is not aware of any evidence that she destroyed or stole any property from the Capitol. Fifth, based on the Government's investigation, it appears that she remained in the Capitol building for a limited period of time.  The defense is not aware of any evidence that she entered any rooms or offices in the Capitol, any personal space or the Senate or House Chamber, other than what undersigned counsel believes to be the outer office of Speaker Pelosi.

To her credit, she acknowledged her misconduct by answering pointed questions by the FBI agents, expressed  full contrition, and voluntarily offered to download as many pictures as she could-and she did.

By the time Mrs. Wilson arrived at the U.S. Capitol,  well after  2:00 p.m., the barriers that had been erected along the perimeter of the building were no

longer present. She met no resistance in her walk to and inside the Capitol. At the time,  she didn't dream she'd be charged for going into the Capitol.  After seeing the video footage showing protestors beating police officers, spraying gas in their faces, screaming obscenities, and destroying property, it made her  cringe. She did not witness any of  this at all. She is left with deep regret, fear, shame, and remorse.

The government concedes that she committed no violent acts and destroyed no property. Her actions within the Capitol have been tracked on the CCTV footage and this demonstrates that while unlawfully present in the Capitol with no excuse, she did not destroy property, steal property, commit violent acts, or encourage others to do so. She entered and exited through doors. And when she spoke to police officers, it was non-confrontational and respectful, even grateful. Importantly, when she entered the Capitol, there were no police officers telling her not to go up the steps.  Once she realized  she should leave, she did.

This has been a long road for Mrs. Wilson and her family.  She has been threatened on social media cites of local news outlets. She lost her job and had to search for a another one.  Just imagine trying to pay the rent and feed your kids on her income. She has had tragic circumstances in her family. She is working hard to keep it all together, which most often falls on the shoulders of the woman in the house, not the man.  She pled guilty at an early stage in the proceedings thus saving

valuable judicial resources. It is of utmost importance to Mrs. Wilson that this Court understand that she is incredibly remorseful for her actions on January 6, 2021.[3] There is no doubt that, as she expressed when interviewed by law enforcement, she wishes he had never come to Washington, D.C. on that day.  None of this will be erased from the internet. It's there forever.  She has fully accepted responsibility for her bad judgement in entering the  Capitol building by pleading guilty in what can be described as the "first wave" of defendants that pled guilty.  She has been the subject of a number of media accounts lumping her with others that were there on January 6, 2021 for violent purposes. Her personal character and reputation will forever be tarnished.  Still, she has had limited trouble with the law and continues to show remorse and sincere regret for getting involved with President Trump's call to the Capitol that day. The criminal history mentioned in the PSR is wrong. Mrs. Wilson maintains there has been some mix up as she has no criminal convictions.[4]

Mrs. Wilson does not seek to minimize the harm caused by her behavior by the explanations in this sentence memo. Nonetheless, in determining what punishment is warranted, this Court should not lose sight that she did no harm, intended no harm, and regrets that she was even there.  Most telling about Mrs. Wilson is

---

[3] The probation officers comment in her recommendation that Ms. Wilson doesn't "appear to fully understand the severity of her actions or the impact her conduct has had on others" has no basis in fact and is completely wrong. The Court should disregard this comment.

[4] Undersigned counsel is working on this and trying to track down the facts. Although an academic exercise as it does not affect the guideline criminal history category if there were one in this case, which there is not, Ms. Wilson wants the Court to know this is inaccurate.

despite all she has been through, she is working full time even after being fired from her job due to her January 6 trip and hoping to find an even better job.  She has the support of her family and friends.[5] Her law abiding past and her post arrest behavior show that she is capable of being a productive citizen and the Court can rely on that as a basis to sentence her to a term of probation considering the 3553 factors.

## B. Need for the Sentence imposed

### 1. General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a person impoverished when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage

---

[5] Letters of support for Ms. Wilson are forthcoming and will be filed before the sentencing.

respect for the law or promote just punishment, but are likely to be

counterproductive, and labeled as political posturing.  A sentence of probation

does constitute punishment  and  it will deter others as one's liberty interests are

curtailed by travel restrictions, reporting obligations, and limitations on one's

personal freedoms. The National Institute of Justice, Department of Justice, issued

a summary of the current state of empirical research stating that "prison sentences

are unlikely to deter future crime," and "increasing the severity of punishment does

little to deter crime."  U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst.

of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel

S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice in America

199 (2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

### 2. Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant

 Mrs. Wilson's likelihood of recidivism is very low. She has expressed

genuine remorse and contrition, has cooperated fully with law enforcement,  turned

over evidence voluntarily, and  accepted the first plea offer tendered with no

hesitation. Her acceptance of responsibility was complete and without reservation.

Research has consistently shown that while the certainty of being caught and

punished has a deterrent effect, "increases in severity of punishments do not yield

significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and*

*Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy

of Science panels… reached that conclusion, as has every major survey of

evidence." *Id*.; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative*

*Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of*

*Recent Research (1999),* summary available at

http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned

by the British Home Office, examined penalties in the United States as well as

several European Countries. *Id*. at 1. It examined the effects of changes to both the

certainty and severity of punishment. *Id.* While significant correlations were found

between the certainty of punishment and crime rates, the "correlations between

sentence severity and crime rates…were not sufficient to achieve statistical

significance." *Id*. at 2. The report concluded that the "studies reviewed do not

provide a basis for inferring that increasing the severity of sentences is capable of

enhancing deterrent effects." *Id.* at 1. Given Mrs. Wilson's  current age (30), and

other issues consistent with what is mentioned above, the likelihood of Mrs.

Wilson ever re-offending is as close to zero as one might come. A  punishment of

any jail time  in this case is going to have the exact opposite effect than what is in

the interest of justice.  The alternatives to incarceration make financial sense,

conserve bed space for individuals from which society would need greater

protection and would serve the ends of justice. Mrs. Wilson urges the Court impose

a sentence of one year probation in this case in light of her significant family obligations, her sincere and complete remorse, her early and consistent acceptance of responsibility, and the lack of a need to further deter her. If Mrs. Wilson were sent to prison, even for a short time, she would lose her house, her children would most likely go to Child Protective Services, and the cycle of poverty would continue. Surely there is a better way.

### C.  The kinds of sentences available

The sentencing guidelines do not apply  in this case.  If this Court were to adopt the government's recommendation, as opposed to that of the Probation Office, it would result in sentencing disparity with other individuals who were similarly charged and behaved similarly. *See infra*.[6]

Largely because of her obligation to her children and her law abiding nature, Mrs. Wilson asks that the Court adopt the recommendation of the U.S. Probation Office and impose a sentence of probation, but no home detention. In the alternative, she asks that the Court consider a non-custodial sentence with a restriction that she remain on her property except for work and excused absences. This would be particularly appropriate given her  job and the harsh punishment a custodial sentence would impose by potentially causing her to lose her job.

---

[6] This does not include every case, just a sampling.

Imposition of a fine is discretionary, and, defendant respectfully submits, should not be ordered in this case.  Defendant's financial condition is such that she cannot pay any significant fine.  *See* PSR, paragraph 57; U.S.S.G. **§ 5E1.2(a)** (fine not recommended if defendant unable to pay).

### D. The need to avoid unwarranted sentence disparities

If this Court were to impose a sentence greater than a probationary term, community service, and/or restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing in this Court.  The following cases are a sampling where a misdemeanor was charged and pled to and resulted in no incarceration:

\*\**United States v. Anna Morgan-Lloyd,* 21-cr-00164 (RCL) (Jun. 28, 2021) (sentenced to probation);
\*\**United States v. Danielle Doyle*, 21-cr-00324 (TNM)(Oct. 1, 2021) (sentenced to probation even though she entered through a broken window and yelled at police officers);
\*\**United States v. Valerie Ehrke*, 21-cr-00097 (PLF) (Sept. 17, 2021) (sentenced to probation);
\*\**United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF Nos. 42 & 44 (sentenced to supervised release with home confinement even though Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied media accounts of violence were accurate, minimized the conduct of all of the rioters, 3) called for a revolution even after the events of January 6, 4) encouraged the rioters to be proud of their actions, and 5) minimized the impact of that day on lawmakers and democracy. *See United States v. Jessica and Joshua Bustle*, 21-00238 (TFH). Judge Hogan imposed a probationary sentence with a short period of home confinement for Ms. Bustle and an even shorter period of home confinement for Mr. Bustle. The government recommended probation in this case.
\*\**United States v. Andrew Bennett,* Crim. No. 21-227 (JEB)(sentenced to three months home confinement and two years probation). According to the government, who recommended probation with a short term of home confinement, Mr. Bennett

espoused conspiracy theories about the election, was an admirer, albeit not a member of the Proud Boys, and boasted about his conduct. According to the government, Mr. Bennett did not come to the rally in D.C. on a whim, but rather planned it for months. He posted numerous times about conspiracy theories and a fraudulent election. On January 4, 2021, he posted to his Facebook page, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!". On January 6, according to the government, Bennet began livestreaming video to his Facebook page from outside the Capitol as early as 1:00 p.m. He was in the middle of the growing crowd on the West Front of the Capitol, where some taunted police officers and sporadically threw objects at them. The government alleges that someone near Bennett exhorted others to "move forward" and that Bennett yelled at a police officer. Bennett also filmed assaults on the police officers and continued to livestream events inside the building.

None of this is to suggest that Mr. Bennett should have received a sentence of incarceration, only to suggest that the distinctions the government draws are hard to justify. There is nothing materially different about Mrs. Wilson or her conduct that would justify a sentence of incarceration and such disparate treatment. The courts have sentenced some January 6 misdemeanor cases to incarceration, but the nature and circumstances of those offenses, as well as the history and characteristics of the defendants in those cases, can be distinguished.

This Honorable Court sentenced John Lolos to 14 days incarceration in *United States v. John Lolos* (21-cr-243)(APM). As the Court knows, he had a history of violence, was thrown off a plane at Reagan Airport for causing a disturbance, and he chanted with fellow rioters. In *United States v. Derek Jancart and Erik Rau*, 21-cr-00467, the Honorable Judge Boasberg sentenced both defendants to 45 days of incarceration. However, in that case, unlike Mrs.

Wilson's, the prosecutors asked for four (4) months of incarceration for each

defendant, citing that the men came to D.C. with gloves, a gas mask, and two-way

radios. *Id.* Additionally, Mr. Jancart posted a video on Facebook during January 6,

where he is heard laughing at police while Mr. Rau screamed, "We have you

surrounded!" Additionally, Mr. Rau, unlike Mrs. Wilson, was on probation at the

time of his offense on January 6 for domestic violence. Additionally, Judge

Chutkan  recently sentenced another January 6 defendant to 45 days of

incarceration in *United States v. Matthew Mazzocco*, 21-cr-00054 (TSC)(October

4, 2021). However, Mr. Mazzocco blamed the violence that day on Antifa, deleted

his social media accounts in an effort to obscure his actions, and refused to give

law enforcement access to the body-worn camera he wore that day, claiming that

he did not know where it was. See https://www.washingtonpost.com/dc-md-va/2021/10/04/capitol-

riot-jail-deter-mazzocco/ In *United States. v. Reeder*, 21 CR 166(TFH), Judge Hogan

sentenced Mr. Reeder to 90 days incarceration because he bragged on social media

about having engaged in battles with the police inside the Capitol, showed no

remorse or contrition, claimed he had no idea he could not be in the Capitol despite

being tear-gassed, recorded attacks on police officers inside the Capitol, entered a

second time *by forcing himself past police officers who were trying to clear the*

*Capitol*, posted videos bragging about his actions and deleted social media

accounts, and most importantly, put his hands on a police officer.   Even after

pleading guilty, according to the government, he portrayed himself as an innocent victim of circumstances.

*Cf: United States v. Glenn Croy*, 21-cr-162(BAH) defendant sentenced to 36 months probation, 14 days in a ½ way house and 90 days home detention. Here, Mr. Croy entered the Capitol not once but twice, engaged in yelling at police officers and was situated in the Capitol in such a way to breach police lines at critical junctures.

Mrs. Wilson was far more cooperative with law enforcement than many of these other defendants, did not attempt to hide any evidence,  in fact produced evidence when asked and has not publicly blamed another group for the violence that day.  All told, the facts of the offense conduct and characteristics of the defendants who garnered incarceration were starkly different than Mrs. Wilson's conduct and characteristics. Mrs. Wilson's actions fall on the low-end of the spectrum that day and her culpability appears to be minimal in contrast with rioters who destroyed or stole government property and assaulted or threatened the law enforcement officers on that date. Like so many others, she was a pawn in a game.

## IV. CONCLUSION

Considering all the applicable factors the Court will consider, Mrs. Wilson respectfully moves this court to impose a sentence of probation.   This sentence  is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a).  It

would be a sentence in the best tradition of federal judicial discretion, that would

consider Mrs. Wilson as an individual and account for her unique failings and

positive attributes that, in the words of Justice Kennedy "sometimes mitigate,

sometimes magnify, the crime and the punishment to ensue." *Rita v. United States*,

551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct.

2053 (1996).

Respectfully submitted,

By:     /s/
        KIRA ANNE WEST
        DC Bar No. 993523
        712 H. St NE, Unit #509
        Washington, D.C. 20005
        Phone: 202-236-2042
        kiraannewest@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify on the 20th  day of January, 2022 a copy of same was delivered to the parties of record, by email  pursuant to the Covid standing order and the  rules of the Clerk of Court.

_____ /S/

Kira Anne West
